Page number 23-1040 Big Rivers Electric Corporation Petitioner versus Federal Energy Regulatory Commission. Ms. Raphael for the petitioner, Mr. Shaner for the respondent, Mr. Pearson for the intervener. Morning, Council. Ms. Raphael, please proceed when you're ready. Thank you. May it please the Court. Dana Raphael for petitioner, Big Rivers Electric Corporation. For Henderson to join the Regional Transmission Organization and share in its revenues, it had to show that it is an owner of transmission facilities. That requires two things. One, that Henderson is an owner because it owns or controls the facilities. Two, under FERC's seven-factor test, those facilities are transmission, not local distribution. The City of Henderson is a tiny utility serving just 12,000 people embedded entirely in Big Rivers' transmission system. Because Henderson has no internal generation or connections with any other utility, every electron of power entering Henderson's system comes from Big Rivers. But FERC nevertheless concluded that Henderson was a transmission owner, shifting more than a million dollars a year from Big Rivers to Henderson for conveying electricity to itself through and from the Big River system. So I'd like to be clear about one thing. When the matter was before the Administrative Law Judge, in his opinion, did he not reference the fact that both parties, that is, your client, as well as Henderson, had experts who examined the documentation that was submitted by Henderson to substantiate its claim of the merits of its petition? And in that respect, that it owned the facilities? Yes, Your Honor. Your client had an expert who examined all of Henderson's proffers to the Commission? Yes, Your Honor. Our expert looked at the ownership and control of six tie lines and specific, as to those specific six tie lines, argued that Big Rivers actually owned one of those tie lines. And everyone agrees now on appeal that Big Rivers actually did own that tie line all along, the sub fours. Doesn't everyone also agree that that's not one of the tie lines that's relied on here? No, Your Honor, that is not agreed to. That is, in fact, a disputed issue of fact. And where did your client race that on in its petition for rehearing? I know it raised it, but I thought part of the argument that the agency was making was that particular tie line wasn't one that was being relied on here by the parties for the purposes of Henderson's petition. Am I wrong about that? Respectfully, Your Honor, the FERC on appeal has said that that is not one of the tie lines that was relied on, that that was not FERC's position before in the proceedings below. FERC said repeatedly, both its trial staff as well as the ALJ, the initial order and the 469 line that everyone agrees Big Rivers now owns was, in fact, not only one of the disputed facilities, but also that Henderson owned that facility. Henderson itself claimed that it owned that facility in its briefing before the commission. How do you read the harmless error principle under the APA? Your Honor, harmless error has to be applied consistent with Chenery Corps, which is that the agency cannot rely on post hoc explanations. And so when you have a factual error, that is a particularly difficult circumstance for an agency to demonstrate that that error was, in fact, harmless, because factual errors, particularly those going to the agency's analysis, are very difficult for this court to assess whether that error pervaded the agency's analysis. And our brief cites several cases as to that point. Brand of error is here. What you would be asking for then is for this court to grant your petition, at least in part, and send it back to FERC to say whether this particular line is part of. The operational. Change is seeking and that at least the agency had heretofore approved. Well, Your Honor, we'd ask that this court grant the petition in full, vacate the decisions and remand because it's not clear whether this error as to the ownership of this tie line pervaded the seven factor test analysis, which is the second issue on which I'm getting at. Hypothetically, take this that there are six lines that are involved in Henderson's petition. And in the course of proceedings, it turns out only five. Are at issue. In the sense that your client claims that Henderson doesn't own them and Henderson doesn't control them, even though MISO. The client is turned over operational control to MISO. And Henderson would qualify to use those. Facilities for operations. Would a and the point now is that. As to the sixth line. In my hypothetical. Henderson doesn't own it. But Henderson's not relying on it. For the purposes of its petition. Even in that circumstance, then we would be obligated to send it back to the commission. Yes, Your Honor, because the seven factor test is a facility by facility test. That's not the way that actually applied it here. Burke looked at all of the facilities together, including the sub four sub four top sixty nine line that everyone agrees Big Rivers actually owned all along. And because that mistake pervaded the agency's analysis, it's very difficult to figure out whether the analysis would come out any differently if you change one of those inputs. And there are two really concrete examples of this in Burke's brief. Burke at page thirty two says that MISO, in fact, studied the flows along sub four sub four top sixty nine when applying the seven factor test. And it also at page forty eight says the reason it should prevail on factor three under the seven factor test, it cites a number about 22 percent of the hours flowing out of Henderson. That number, Your Honors, if you look at J.A. eighty eight through eighty nine, that number was MISO's expert. And MISO's expert said that it was relying primarily on this line. Seems like all of this confusion has arisen because your client turned off this line after these proceedings started. And so the both the initial decision and the commission are very clear that they're looking at both pre reconfiguration and post reconfiguration. So I guess my specific question to you is what in the analysis of the post reconfiguration a setup is impacted in any way by the sixth line? Because to me, it seems to come down to this chart on J.A. ninety nine, which acknowledges that sub four sub four top sixty nine is turned off. And I didn't see anything in the analysis of post reconfiguration system that mentions that line at all. So what would you point to to dissuade me of that? Yes, Your Honor. Well, so factor three is the only factor in which the commission specifically referenced the post configuration and did that analysis separately. The rest of the factors do not separate out pre configuration and post configuration. And so while the agency said it did not matter whether or not this line was part of the analysis, it didn't then separate analysis as to each factor. So there's that initial problem. But even as to this, this third factor, which is when the commission looks at this chart, the commission does two things, Your Honor. So first, pre configuration, it cites this twenty two percent hours number and then it says post configuration, it's the same expert, this J.A. ninety nine, which comes from this expert hacker and says that while there is an increase on one of these lines, we think that is sufficient based on what the expert said. But if you look at what the expert actually said, she is comparing the increase on that line compared to what the number was before the system configuration. So it's still a relational comparison. But if that line that Big Rivers owned all along, regardless of the disconnection or not, if that line should never have been part of the analysis, then whether there is an isolation to the when you look at the numbers with that line in the analysis, then the whole analysis might come out differently. Looking at that number in isolation is very different than doing a comparison when you have an input that shouldn't have been there in the first place. And this is not in the records, Your Honor, but. But there's a lot of anything that's not in the record, please. That's part of the problem here. Well, the numbers are in the record, but. No, I'm quite serious about this, counsel. This whole case and your argument is turning on the record. Yes, Your Honor. So I misspoke that the table in the record that the parties are referring to and that FERC at 48 is pointing to this 22 percent of outward flow number. They don't provide the number. If you take out this disputed tie line that Big Rivers actually owned all along, everyone agrees that Big Rivers owned, but applying the same math they applied to get their 22 percent number, the number would be 2.3 percent. And so FERC, at minimum, needs to go back and look at its analysis and determine, OK, Big Rivers own this line. I did the same math and had the same question. But one thing about this case is, you know, that gets to so under factor three is 8.9 percent on one line or 2.3 percent across all lines. Is that more than rare? And I don't think you've made you've challenged that finding on appeal. Your argument seems to be very different that you should look only to net power flows. And so the time basically this chart is irrelevant. We should be looking at the magnitude of power in each direction. And that's sort of in a different bucket than an argument that 2.3 or 8.9 is insufficient. Well, no, your honor, our our position is that the commission applied an overly rigid interpretation of the seven factor test and that repeatedly discounted arguments about net power, which isn't just what is the bottom line number, but looking at the amount of power flowing out. Rivers witness at J233 through 234 looked at the charts that Henderson and Miso put into the record that even looking at their numbers, 99.7 percent of the power entering Henderson system is consumed by Henderson and the remaining power that is exiting system. Again, when we take out this line that Big Rivers owned all along and should not have been part of the analysis, when you look at the power exiting the system, that is for these rare contingency scenarios. And the commission's precedent has said when the power exiting system is relatively small and it's for these border communities or contingency systems, that is not the facility's primary function. And that departure from commission precedent is what Big Rivers is challenging here. Is your interpret? The commission at least says that hackers tables are not. They're both under ordinary conditions and urgency conditions. So when this read line shows 8.9 percent, I think they're saying that's under ordinary operation. Is that incorrect? It sounds like you're saying that's not our understanding of the record. Our understanding is that when particularly L.J. was referring to both normal and contingency operations, those normal operations were referring to when you include the disputed tie line, the tie line that Big Rivers owned, that is had normal flows outward. But when you look at just the facilities under the current system configuration and taking out the one that Big Rivers own, the outward flow there, Big Rivers has always maintained is for contingency scenarios. And that is worn out at 99 through 100. And when HECR is talking about this 8.9 percent and talks about analyzing that number under various contingency scenarios and Big Rivers testimony at 233 through 234 says that the So there really is not a dispute as to that issue to the extent that the commission wants to take another look at this with the right inputs that's for the commission in the first instance. I know you cite Big Rivers' evidence, but what I'm trying to get you to focus on is there was other evidence before the commission. And Judge Garcia has highlighted why we're in this difficult position. And maybe because of the sua sponde action of their client, which has been referred. But there was other evidence and the commission in its orders responds to what it understands the arguments to be. And then on rehearing with this one exception that you're arguing, it repeats its objections, but points to no evidence, to no error, says the commission. It doesn't tell us where we've heard. So that's why in this one instance, it's important that we hear and I suppose give us the other insights, not only what your client said, but what the experts said based on their response to your client's evidence and where both the ALJ and then ultimately the commission came out. And I'm not saying you may not prevail in the end, but it's important, particularly in the circumstances where all of this work was done and then your client changed the ballgame. And now wants to say that it gets the benefit of that. And we want to be very careful. And I thought that's what the ALJ was very careful because he said, I'm not going to make certain findings because of these changes. But I've looked, as Judge Garcia pointed out, both at the evidence before and after your client's action. And then the commission said the same thing. And that's why at least one reason I'm asking you so closely about these things, because this is very troubling. A few responses to that, Your Honor. As to the disconnection, Big Rivers has always maintained that the disconnection was done to enhance the reliability. I understand it has. All right. But the commission has referred that for consideration and not taken any position yet. And I'm not suggesting the court is going to take a position. But your client did not say on re-hearing in its petition that it had a legal right to do what it did in the middle of the proceeding the way it did it. So I'm just dealing with the record we have. And obviously, you're going to be much more familiar with Big Rivers' record. And that's why it's helpful to hear what you're citing so that at least we can hear the argument, how the agency responds, and then decide if you have rebuttal. Yes, Your Honor. Would you like me to provide the record citations in which the FERC proceedings address the ownership question? Oh, I've already got those in my notes. Okay. Well, Your Honor, just as your question on why Big Rivers didn't discuss on re-hearing that on this ownership question, Big Rivers did raise its ownership objections. It didn't raise an issue about this system disconnection issue because that was not part of the commission's findings. The commission was very, very clear at JA-453 that the system reconfiguration was not going to factor into, or the reason for the disconnection was not part of the commission's analysis. And so Big Rivers had no reason to object. There was nothing to object to on that front. To object to its disconnection without authority? Your Honor, there was nothing to object to because the commission said that it didn't matter. You understand what I'm getting at, don't you? Wouldn't be in your client's interest to object. But the point is the commission on re-hearing was very clear, saying your client repeats the same arguments, but it doesn't show where error has occurred. And the one exception is what we've been talking about mostly this morning. So it's important, at least to me, to understand that that is the circumstance in which the court is considering this case because your client and you as a representative know what your burden is in terms of when you seek re-hearing by the agency. Do you mean the decision on the seven-factor test, Your Honor? I mean the decision in order 580-A. Yes, Your Honor. So on re-hearing, the court did, or FERC did two things. FERC said first it was going to look back at these ownership and control claims, and the commission said, gave one sentence, which was that nothing in the record indicates Henderson does not own its facilities, and yet concluded- Actually, counsel, I was shocked when I went to read that statement in paragraph 11 because that takes that statement out of context and ignores the statements in that same paragraph where the commission specifically refers to Henderson having proved ownership. So that doesn't get you anywhere, at least with this judge. Well, so Your Honor, the ultimate conclusion on ownership was that Henderson properly owns, operates, or controls the Henderson facilities, which, quote, include the six tie lines that are at issue in this docket, including the sub-4, sub-4, tab 69 line, quote, alleged to be owned by Big Rivers. So the commission concluded, based on apparently the evidence that Henderson submitted, that Henderson owned everything. FERC agrees in its brief, FERC-30, that Big Rivers offered concrete evidence of ownership as to this one disputed line that everyone agrees Big Rivers now owns. And on rehearing, the commission's explanation for how it got to its ownership conclusion was the one sentence, which is that nothing in the record indicates Henderson does not own its facilities. And so Big Rivers' argument for this court, that that conclusory sentence on ownership is just not reflective of what FERC did, whether it held Henderson to its burden of proof, whether it looked at what Big Rivers- Let me ask you one other question. The commission's position based on what was before it, Henderson either had to own or control. And the commission made findings on why it concluded Henderson controlled. And as I understand your argument, this one line still creates a problem. So yes, Your Honor, we believe that the admitted error as to this one line is the easiest way for this court to cut through this case and to say with an admitted factual error, the easiest thing- I think it's the easiest way, counsel. That's the only way presented, all right? As I see it at this point, in terms of what your petition for rehearing raised, how you responded to the commission and what the commission said. And that's what I'm trying to be very clear about in terms of what is before this court at this point. And I mean, I'm going to ask counsel for the agency a lot of questions too, but I mean, I just want to be clear where you are. Yes, Your Honor, clear. Is there a particular point that I could clarify? Well, I mean, I think general statements about the easiest way for us to handle this case, I get that, but I mean, I haven't seen another way. That's why I brought up this control, because it's ownership or control. And the commission was very careful to separate those two. Yes, Your Honor, I'm happy to address the control issues as well. We do think that this factual error as to ownership is sufficient because it pervades the entire analysis to send the case back, but separately as to control, Big Rivers did identify as to these six timelines, several contractual agreements that it argued. And the commission indicated why none of those survived your client's surrender of operational control of its facilities, to me so. Your Honor, FERC gave two reasons why it said that it was not going to consider the substance of these agreements as to the control issue. Both of those reasons do not survive the commission's own precedent and past decision making. And it distinguished its precedent. Well, Your Honor, the two reasons that the commission gave are inconsistent with its own precedent. So, two reasons where FERC said, one, the agreements were not explicitly listed in the MISO tariff, and two, that any MISO member can use the facilities. Neither of those reasons are compatible with the Midwest cases that FERC decided previously. And distinguished. That's my only point, counsel. You may not agree with FERC, but at least the commission, in its order and on the hearing distinguished. All right. I'm sorry to take so much time. My colleagues don't have additional questions. One clarification. So, we were trying to get to the bottom of whether the inclusion of this sixth line as being owned by Henderson infected any of the other analysis. And I think the specific point you directed me to was the commission saying there was an increase after the disconnect. So, there was still a comparison going on. And so, even if, I just want to understand, even if Henderson doesn't own that line, what was being measured before was still the amount of power flowing from Henderson's lines out across something Big Rivers owns, right? So, wouldn't that still be relevant evidence of whether Henderson is transmitting power? Well, Big Rivers' position before the commission was that because this line was both and that the commission had to look at the current system configuration. Right. So, but if it was just that Big Rivers owned it and we were looking pre the disconnection, it could still be relevant, right? In other words, wouldn't be wrong to look at what was happening on that line before or and after the disconnection because it's evidence of what Henderson's system is doing, right? Well, again, Big Rivers' position was that before the commission is that the commission has to look, and its precedent says this very clearly, at the current system configuration, not how the system was historically configured. And because that tie line is not connected, the proper analysis is the current system configuration, not historic flows on a disconnected line. Thank you. Okay, why don't we hear from the commission now? We'll give you a little time for rebuttal. Okay, if it's okay, if it's okay with your honors, I may actually raise my podium here on this and I'm going to put myself on mute briefly while I do that, if that's acceptable. Sure. Thank you, your honors. May it please the court, Houston Shaner for Respondent Federal Energy Regulatory Commission. And I'd like to start where Judge Garcia left off quickly to clarify some of the confusion around this. As I understand Big Rivers' argument on our hearing, they never made a claim that all pre-disconnection flows were relevant. They conceded that they were sort of both relevant and never disturbed the commission's findings of paragraphs 22 and 23 of the order on initial decision to that effect. Now, if you'll look at that in GA page 89, you'll see thousands or really hundreds of hours of flows both ways, even over the own tie line, as Judge Garcia noted, which is substantial evidence and evidence that they never really managed to assail below. Now, I also like to correct the record from some of the previous discussion on table two at GA 99 and GA 100. There were some back and forth with including with Judge Rogers on the normal flows versus contingency scenarios and what this evidence means at GA 99. If you look at GA 99, it is clear it is three months of data in table two. It is thousands of hours of flows across the lines post disconnection. So, that's very clear that it's not merely contingency scenario evidence. The contingencies are described at the top of GA 100. On the next side, you'll see four contingency outages listed there, but that is not the same as the evidence on table two and GA 99. So, I just want to make sure that we're clear with the record there. And this evidence of table two is particularly important because, as Judge Garcia discussed earlier, when we're wondering whether or not the sub four TAP 69 error, in terms of describing it as one of the proposed facilities, matters for the seven-factor tests, it's very clear it does not here because Big Rivers actually disconnected the lines. And as the commission found, based on this evidence, the flows largely shifted to other areas. So, you still have material flows going between to and from Henderson and Big Rivers during this three-month period after the disconnection, which sustains the commission's findings in part under factor three, which is paragraph 78 of the order affirming the initial decision, which I'll call the affirming order here. And that finding is then incorporated as part of the basis for both factors four and factors five. So, unlike my friend's assertion earlier, it is not the case that the commission only considered post-disconnection scenarios or evidence for factor three. It's really factors three, four, and five. The finding of bidirectional flows is most explicit and most fully explained in factor three in paragraph 78. But then you'll see the reference to those flows also in paragraphs 87 through 89 for factor four, then I believe it's paragraph 96 of the affirming order for factor five. Now, my friend also mentioned the 99% number or something to that effect as I believe for description of pre-disconnection flows. And we really need to sort of unpack some of the confusion around this. You'll see that 99% number explained at JA 178. This comes from Big Rivers expert witness Chambliss. That number is for the 2015 to 2018 pre-disconnection scenario. And it is a version or a species of what Chambliss calls net flow. But the 99% number he derives is simply by looking at the inflow only and excluding the outflows over the sub-floor, sub-floor, top 69 tie line, which is both sort of material, is wrong for one reason, because he's looking at the megawatts and that's covered in our brief. And I believe Judge Garcia mentioned this earlier, but it's wrong for a second reason because it's sort of a cherry picking the wrong counterfactual here. Cherry picking the data improperly. What in fact happened when they disconnected the flows as shown again in table two, many of the outward flows shift. So bi-directional flows were sustained even post-system configuration or disconnection of that line. Now, this is relevant also to the harmless errors because my friend sort of raises doubts about whether or not the reference in paragraph seven of the recurring order to the sub-floor 69 tie line really matters for the seven factor test. I believe the commission's comparison or the MISO experts comparison, the commission's adoption of that evidence showing that both pre and post connection, the flows still remain bi-directional shows you that there is no doubt that factors three, four, and five here did not depend on ownership of that line. It's just very clear. It's in the record. In that sense, big rivers ended up undermining their own argument here because we know what the world looks like in both situations. The only sort of really the only evidence they have otherwise is sort of this 99% number, which is not a true hypothetical and is simply cherry picking the data. Well, let me just be clear. I didn't understand your brief to be taking the point that this connection didn't make any difference whatsoever. All right, which is- No, it's certainly- Go ahead. That's correct. That's correct, your honor. Pre-disconnection, if you look at table one at J89, you'll see at the sub four TAP69 line, there are nearly continuous outflows from Henderson to big rivers. What other witnesses call an almost daily basis of outflows, even though there are also inflows occurring at maybe other points. And if you look at the average of all six tie lines, that's the 22% number. That's sort of the hours as a whole. That's the bottom of the chart at J89. But if you're looking really at whether or not there are outward flows, they are nearly continuous there. And it is true that once they disconnect the line, you then go to J99, and that's the table two. And it's certainly not every day or not 98.9% of time having outward flows, but it is close to something like 10%. It's 8.9% over one line, plus some change on the other lines, which gets you rounding up to roughly 10% of the time. And as Judge Garcia said or noted, the commission was well within its rights under cases like green development LLC to say that, look, 10% is enough for factor three here to point towards transmission. And because we've established bidirectional flows here, that also informs the commission's analysis under factors four and five. It would separately be, the commission would be within its rights interpreting its own order 888, which as you've noted, uses the word rarely. And is 10% necessarily insufficient for rarely? There's nothing that establishes that. And certainly nothing that's been preserved jurisdictionally here that establishes the 10% is too low for factor three. Hopefully that, I believe that answered your question. Well, I don't pretend to be an expert in this area, but I mean, a large transmitter resists competition from a small operation. All these years, I haven't seen a disconnect after the petition is filed and the expert. That is true. Very unusual. I never thought that we could just sort of ignore that in terms of the ultimate analysis here. I mean, you heard counsel for big rivers this morning say, you know, we don't know what the commission would have done, et cetera, et cetera. Your argument is, yes, we do because either the flow shifted or as to flows, they were sufficient under commission precedent. And I'm putting words in your mouth now, but I want to be clear that this is a correct interpretation that it doesn't matter for purposes of the review of the commission's order orders that outflows might have occurred in one spot with the disconnect. Now they occur in another spot and the same with the inflows, but that really doesn't matter. I get the point about you can be a transmitter without all these facilities being close together. But I guess I'm a little unclear counsel and help me here is that are you arguing that if we can find a chart that has the numbers that are adequate under what the commission requires and what statute requires, it really doesn't matter whether the commission was looking at other data and that the experts who were examining the data were looking at other data because we have a redundancy of data, as it were, that establishes what Edison had to establish here. I think the last part of your statement, Judge Rogers, is correct. There is a redundancy of data here. We have it both pre-disconnection and post-disconnection. There's also even a redundancy of experts. The commission, for example, in paragraph 78, reviews the testimony of the MISO witness, Mrs. Hecker, the trial staff witness, Mr. Magna, and then also considers Mr. Chambliss's arguments, even though he's not an engineer, and concludes that the most compelling evidence is the sort of empirical, metered evidence of actual flows at JA99 and 89, along with the contingency scenarios at JA89 and JA100. So you think if I go back and parse the commission's decisions carefully again, that's going to be what I find? I think you will find it's very clear to the commission. It's logical that expert evidence is only as good as the evidence it's looking at. To some degree, but the commission understood the evidence here, both at the expert level and the underlying data, and it thought it was quite clear and certainly sufficient to establish the flows outward were more than rare, as the language of Factor III would require. I didn't see it use the word redundant, though, in any event. That's my word, not a commission. But the commission was, as Judge Rogers noted, very clear that it examined the empirical evidence, both before the disconnection and after the disconnection. That's at paragraphs 22 and 23. And then you'll see it again in paragraph 78, in which paragraph 78 is the basis for other discussions of bidirectional flows in paragraphs 87 through 89 and then 96. Counsel, can I ask you to clarify something for me? And I want to be clear, I think this is not really an issue, but it seems that everyone's agreeing that it would be sufficient if Henderson either owns or controls the facilities. Can you help me understand why that makes sense? So hypothetically, if Henderson owned these facilities, but actually had binding contracts that deprived them of control, why would they be able to join a regional transmission system? That's simply the language of the Transmission to Owners Agreement and also the tariff, I believe, as the tariff defines transmission owner. As the commission notes, the eligibility criteria are phrased as separately sufficient. Both documents use the disjunctive or. I believe you'll see that repeated at hearing order paragraph 11, as well as affirming order paragraph 4. Do you have any understanding of why that makes sense if you own but have no control over your own facilities? Maybe the question. Yeah, I think you are certainly correct, Judge Garcia, in that, especially really with control, what you're looking at here is, can you allow transmission service over these facilities? Right. And that's really like the jumping point of this. That's how you certainly read their control arguments, for sure. I mean, the ownership, I think, is sort of straight up and down, and it's just sort of clear the text. But control is a little bit looser concept here. And to start on control there, I would note that Big River's position sort of raises two possibilities, but they can't really meet either of them. On the one hand, they have sort of these what they call sort of a group of contracts. If those contracts impact or restrict transmission service to or from MISO and the MISO integrated network, then they have to be grandfathered under the MISO tariff, or they're going to be preempted as conflicting with the tariff. Now, there's no dispute here that none of their contracts were actually grandfathered, or they would be listed in attachment P to the MISO tariff, but no one disputes that. So if they make a claim that these contracts, in fact, restrict transmission service between Henderson and MISO, which includes Big River's transmission facilities, then they have to make sure that those contracts are grandfathered. Now, they wholly failed on that. The other alternative is that the contracts do not, in fact, affect transmission service. But if they do not affect transmission service, to go to your earlier question, they're not relevant to the legal question of control, because MISO can still affect transmission service over the Henderson facilities and the Big River facilities. And they try to read the MISO 04 to 05 decisions as creating a sort of liminal space between total irrelevance to control and preemption under the tariff. But that decision simply doesn't say that. The MISO 04 decision says that, okay, you had a grandfathered, you grandfathered an agreement that we thought might affect transmission service. You're saying now it doesn't affect transmission service. It only addresses things like financial obligations, which are just sort of orthogonal transmission service. And because of that, we can remove it from the grandfathered list. But if they're correct that these contracts are like those in GFA number 374 in MISO, then they're simply irrelevant to the prospect of control. And that's what the commission was trying to say in paragraph 12 of the recurring order. They say that to the extent that these contracts do resemble GA number 374, it does not change the outcome, because you're just not speaking to the question of control. And that is, I think, the easiest out on the sort of eligibility criteria, because there's no dispute that Big Rivers has signed up to the tariff and the preemption would apply. But there's really no basis for getting out of either that or the question of irrelevance. And really, on the relevance issue, they never explain what the contracts do in terms of transmission service. They're not even in the GA. So we're just talking about sort of an amorphous blob of contracts here that supposedly block off service to all six tie lines, even though the presiding judge and then the commission in paragraph 32 of the affirming order said that we can dispose of these individually as either not grandfathered or simply irrelevant. Okay. Council, let me make sure my colleagues don't have additional questions for you. Thank you. We'll hear from Intervenors Council now. Mr. Pearson. Good morning, may it please the court. My name is Steve Pearson on behalf of Intervenor City of Henderson, Kentucky Utility Commission, Henderson Municipal Power and Light. To address some of the issues that you've been talking about this morning. I think the biggest issue is Henderson ownership of facilities. And to start by pointing the court to Joint Appendix 108 to 110. That is an excerpt of the Transmission Owners Agreement. That is the agreement that Henderson signed with the system operator that initially started this case. Now, what's significant about what's listed at 108 to 110 of the Joint Appendix in that Transmission Owners Agreement is those are the facilities at issue in this case. That is the definitive list. Importantly, one of the facilities that is not on that list is the sub four sub four tap 69 line that we've been talking about. It's regrettable that there has been some confusion about ownership that has been created. But that definitive list does not include that tie line. So why are we talking about that tie line pre disconnection? I think counsel for the commission makes very clear that there was substantial flows over that tie line. So what happened was is pre disconnection. You have a transmission facility, a big rivers transmission facility interconnected with substantial flows off of the Henderson transmission facility to the big rivers transmission facility, indicating that these facilities operate in transmission. As counsel for the commission has pointed out, post disconnection, you still have substantial transmission flows, or at least sufficient transmission flows that the commission found that it exceeds the rarely if ever test. It's it's consigned to a different market consigned to a different geographic area that's test four and five and both of those in both of those findings, the commission references those data tables. And I would also point counsel address the issue of whether that the confusion of ownership of that line infected the entire analysis. Well, I would direct the court to exactly what the seven factor analysis is. The first one is proximity to load. How could a big rivers facility? Whether, you know, it's it's a big rivers facility. So it's not proximate to Henderson's load. It's big rivers facility in factor two. So it doesn't affect whether the Henderson facilities are looped or radial. We've discussed factors three, four and five. Factor six is metering. There's metering on other facilities and it's got to be bidirectional. And the record shows that it's bidirectional. And factor seven really wasn't in dispute. In this case, it's voltage. My time is up. I would be happy to answer any questions from your, your honors. Thank you, counsel. We appreciate your argument. Thank you, your honor. Rafael, we'll give you three minutes for Robo. Thank you. Few responses, your honor. First, it is disputed whether the sub four sub four line is one of the facilities. If that if FERC calls that an inadvertent mistake and it's briefing, but if it was inadvertent, it was apparently universal. Everyone below treated that facility as one of the disputed facilities. Could I ask you, do you agree or do you dispute intervenors direction of the court to the listing of the facilities that are at issue here, namely, in the agreement that your client signed? Part of which appears at jail 108 dash 110. Big rivers did not sign that agreement. That was a submission by the transmission operator, my so and Henderson. And yes, our client does dispute whether that is necessarily the full list of facilities. Because Henderson itself told the commission at J.A. 441 that it owns the sub four sub four top 69 line. The A.L.J. acknowledged Big Rivers ownership claim. Counsel, when Henderson and me, so sign this agreement. Say, here's what we want to do. Do you agree that this line that we've been talking about was not listed? There's we don't dispute that on the particular J.A. pages that my friend on the other side points you to that this that the that line is not on that list, however, at least as to. The party petitioning. Here in terms of petitioning to the agency. For this authority and me, so those were the only lines issue. That raise objections to all kinds of reasons, but at least the proposal that was on the table. Well, that's sorry about this case. Yes, Your Honor, we agree that the situation is a little bizarre, but that's simply not how the commission treated treated the lines the on the initial order says that Henderson owns and controls that particular timeline. That's J.A. 463. Big Rivers objected and said there is evidence in the record, not only that we own this line, but there are control issues as well. And on rehearing the Commission just double down and at J.A. 515 says. Okay, now counsel explain to me, if you will. What what you think happened here, just so I understand. Henderson went to me, so they entered an agreement. Involving let's just say five lines. By the time the matter got to the hearing, the administrative law judge and his decision. The agreement has morphed into. Something where Henderson was seeking six lines. It's not clear exactly what happened, Your Honor, but there were, but that is, in fact, what happened? Well, Henderson claims that it owned that line and that that particular line was an issue. Big Rivers claims, but I'm just trying to understand, counsel, my own mind. Henderson goes and says to me, so I want to. Be in control of these five lines. Niso says, okay, so we've got to go to the Commission. We've got to get the care of all those sorts of things. But by the time the matter comes before hearing, we're really talking about six lines. I mean, that is perhaps one way to read the record, Your Honor. Yes. And I mean, you're more familiar with this than I was just all right. We're spending all our time on something that the parties, at least initially, said they weren't interested in. Well, Henderson and Niso, sorry. Right. Until Henderson changed its position and claimed ownership over that line. To address much of FERC's argument on appeal is trying to make up for the deficiencies of the Commission's order and coming up with new explanations. And the APA requires those explanations to have been by the agency in the first instance. If the ALJ opinion says, here's the record. Here's the testimony. Here's all the evidence that they had before them. And I find it sufficient to show that Henderson has ownership and control. And the Commission says, on review sought by your client, we're affirming those findings. As I understand it, it's not that the evidence isn't there. But they didn't say something. And it wasn't until the petition for rehearing that the Commission finally addressed your objection about this 169 line. Well, a few responses to that, Your Honor. The ALJ did not make, did not decide ownership or control. The ALJ says at J268. No, no, no. I know he didn't. But he cited all the evidence. And he cited the experts that your client had and that Henderson had. Yes, Your Honor. So the first time the Commission separately addresses ownership and control is on rehearing. And that's where the Commission says explicitly that Henderson. It wasn't separately addressed. The Commission in Order 580 addresses ownership and control. Yes, Your Honor. But it's in more general terms about ownership and control. And then largely. Because Henderson owns and, you know, operates, controls. So it goes through the six tie lines as to control, but does not say anything as to ownership specifically. And then Big Rivers objected, said there's evidence that Big Rivers both owns and controls these tie lines. And on rehearing, that's when the Commission says that Henderson owns and controls all these lines and that nothing in the record indicates otherwise. And so before this court, our argument was that the evidence that Big Rivers put into the record about ownership and control was simply incompatible with the Commission statement that nothing in the record indicated otherwise. Now, the Commission believes that on appeal, that perhaps there was this robust burden shifting. I agree with that, but that's not the way your brief reads. Oh, well, Your Honor, that's exactly what we said in our briefing, which was that. You said that the Commission hadn't met its burden of proof because look, it was saying that the burden was not on Henderson to show that it had ownership or control. I mean, with all due respect, counsel, you say you cite this sentence at least twice in your brief. Yes, Your Honor, so when we filed our opening brief, the Commission still had not admitted that it had apparently agrees now that it made this error. And so what Big Rivers had before it was the evidence put into the record as to ownership and control, the Commission's one line statement that nothing in the record indicated otherwise, and Big Rivers' position was that that one line statement seemed to put the burden of proof on Big Rivers to disprove ownership and control when the burden of proof was on Henderson and MISO to affirmatively demonstrate ownership and control. Now, the Commission's answer on appeal is that apparently the Commission engaged in robust burden shifting analysis and concluded Big Rivers didn't meet its burden. The Commission's decision on rehearing, we've talked about paragraph 11, where the Commission says we remain unpersuaded. And you say the Commission is just wrong about that. All right, now on appeal, the Commission acknowledges it's wrong, at least in that part. But then as to paragraph 12 on rehearing in order 580-A, the Commission states, quote, moreover, we sustain the explanation and conclusions in our previous opinion that Big Rivers has turned over operational control of its facilities to MISO, including Big Rivers substation and tie lines that interconnect with the Henderson facilities. MISO's use of the Relwood facility is not limited by Big Rivers cited statements, excuse me, Big Rivers cited agreements. Big Rivers has not disputed that it gave MISO operational control of its facilities and does not allege that the agreements actually were grandfathered. And it goes on. So as to control, there was a clear finding. Excuse, yes, right, control. Sorry. Yes. Yes, Your Honor. So the argument about the complete lack of explanation, the burden shifting problem, that was as to ownership. But it says moreover. In other words, even if we're wrong about all that, all right, look, Henderson has control. And what is required to have is either ownership or control. Yes, Your Honor. But as to control, as Big Rivers argued in its opening brief, there were two defects in the commission's answer as to control and defects that the commission has yet to explain on appeal. And in fact, this is a perfect example of the commission coming up with explanations on appeal that differ from what the council, those alleged errors are your client disagrees with the commission's interpretation of its precedent. Respect, Your Honor. No, that's not right. That's what you said. You said the commission gave two reasons, right? Yes, Your Honor. And neither reason is compatible with the decisions that FERC gave before. And that's what I'm saying. FERC interpreted its precedent differently than you or your client. That's all I'm getting at. I'm not saying who's right or wrong, but that's what happened. Well, Your Honor, FERC attempts to come up with explanations on appeal, but those answers differ from what the commission said. So a perfect example of this is that the commission says at 519 that these agreements. See, counsel, I'm focusing on what the commission said. Yes, Your Honor. It said it didn't agree with your client's interpretation of its precedent. It said why? It said those situations were different. Your Honor, it did not address the two reasons that it gave. But that was the first time the commission gave those reasons. And so Big River is arguing here that those two reasons are not compatible with the precedent. And an example of this is that the Midwest cases, the commission said at 519 on rehearing  and relevant respects to the agreements in this case. Now, FERC's brief at FERC 38 transforms that finding and says that the agreements were similar in some respects, but ultimately irrelevant. That's not what the commission said on rehearing, which is that they were similar and relevant respects. Now, the two reasons. What paragraph are you citing?  That's paragraph 12, Your Honor. That's right. Yes, so it's on 519 at the top on the third line, the second and third line, similar and relevant respects. Yes. I mean, relevant respects doesn't mean necessarily dispositive, does it? Perhaps not, Your Honor. But the finding was similar and relevant respects. And FERC on appeal changes that to some respects, but ultimately irrelevant. That's not what the commission said.  The finding was that the agreements were not listed in the tariff, but that was just as true in the Midwest cases, where in Midwest, the entire premise of the commission's process was to determine whether those agreements should be listed in the tariff. In the Midwest, were the agreements part of the record? I'm not aware if they were. Well, they're not a part of the record here. You agree with that, don't you? Well, they're part of the agency record, Your Honor. They're not in the joint appendix, because the commission determined that the substance of the agreements, it wasn't even going to look at the substance. So we did not feel that there was any basis to put them in the joint appendix itself, but we're happy- They're not on appeal. They're not in the record for the court to look at, right? In the joint appendix before this court, Your Honor. But they are in the administrative record. Big Rivers exhibits five, six, and nine submitted those agreements in full. There were certainly factual disputes as to what these agreements said and did. And the commission simply didn't wade into any of that because it gave these two reasons that it said it wasn't going to look at them. But again, those reasons have to be compatible with the commission's previous precedent. And when the commission has said in the past that these two, the Midwest cases, that the agreements could be excluded from attachment P, which JA 455 talks about how attachment P is the MISO tariff's official listing of permissible grandfathered agreements. And so agreements could be excluded from the tariff and yet, quote, remain in effect and not be impacted by such lack of inclusion in the tariff. Big Rivers argued the same circumstance should be true here. If the agreements are not listed in the tariff, they should still be operative. So the reason the commission gave was not compatible with its own prior decision. Now, the second reason that the commission gave, which is that MISO had control over these facilities, was a similar problem. And that the transmission owner there was also a member of MISO. And so membership in MISO was sufficient to make those agreements not operative. And surely the commission couldn't have said that the agreements would, quote, not be impacted by such lack of inclusion in the tariff. And the commission still has no answer to those arguments on appeal. The commission instead, its counsel says that the agreements were just irrelevant. That's not what the commission said. Now, there are certainly circumstances in which the commission could parse the record and come out the way that FERC's counsel on appeal says that it could come out. But there's no guarantee of that. And where there's any uncertainty and an admitted factual error, the right answer is to send it back to FERC to look at this in the first instance. Thank you. So you think the commission's whole discussion of its precedent when it was looking for purposes of opinion number 579 is irrelevant?  That's at the, let's see what page. That's on the rehearing at JA 519. That's where it starts. You mean paragraph 12 that's discussing the Midwest cases? No, you've already told me what you think of that. So that's why I asked you about what appears now as to the discussions as to order 579, which appears starting at paragraph 13. Gridlines, your honor. So that pertains to the seven factor test. That's not really correct. That's what I'm dealing with now. That's what the subheading says. Seven factor test for jurisdictional transmission facilities. That's what the commission's order says. That's what it's dealing with here. Yes, your honor. So just to clarify, there are two issues that FERC has to went on here, both ownership and the seven factor test. And on the seven factor test, Big River's argument was that the commission's explanation were not consistent with its precedent. And gridlines is part of that. And the commission answers is all I'm getting at. You may not agree with its answer, but it answers. It says Big River's mischaracterizes the commission's analysis and conclusions. I mean, you may disagree with that, but that is what the commission said on rehearing, as opposed to suggesting it just didn't look at it and never responded to Big River's argument. That's all I'm getting at. Yes, your honor. Big River's position was never that the commission ignored gridlines specifically. Big River's position on the seven factor test was that the commission departed from its past precedent, which looks at the primary function of a facility and not particular contingency operations. And that gridlines was a great example of this because gridlines talked about net flow and looked at net power flow. And the commission on multiple factors said that net flow was not relevant. And so gridlines was part of Big River's larger argument that this departure from precedent violated the APA. As to the seven factor test. As to the seven factor test, yes, your honor. Okay, thank you, counsel. Let me make sure my colleagues don't have additional questions for you. If not, well, thank you. Thanks to all counsel. We'll take this case under submission.
judges: Srinivasan, Garcia, Rogers